Moss *et al. v.* Mississippi Live Stock Sanitary Board.

(Division A. May 27, 1929. Suggestion of Error Overruled June 10, 1929.)

[122 So. 776. No. 27739.]

*Ellis B. Cooper* and *Collins & Collins,* all of Laurel, for appellants.

*Robt. L. Bullard,* of Hattiesburg, for appellee.

McGowen, J., delivered the opinion of the court.

The appellants, B. L. Moss and seven other farmers residing in Jones and Jasper counties, exhibited their bill in the chancery court of Jasper county against the Mississippi live stock sanitary board and the officers thereof, praying for a temporary injunction restraining

appellee from in any way interfering with appellants' live stock, and restraining and enjoining appellee from undertaking to trespass upon appellants' premises for the purpose of inspecting and dipping their live stock, and from in any way interfering with appellants' liberty and their right to full and complete enjoyment of their live stock, and to enjoin appellee from enforcing the rules and regulations, and requiring appellants to carry their cattle and live stock to the dipping vats at Stringer, or to any other place, at unreasonable times and unreasonable distances.

A temporary injunction was directed to be issued as prayed for, and, by agreement of the parties, the cause came on to be heard in vacation. Proof was taken on the issue presented by the bill on the merits, and the injunction was dissolved; five hundred dollars attorney fees were assessed against the appellants as damages for the wrongful suing out of the injunction; and the bill was finally dismissed, hence this appeal.

The bill alleged that appellants were property owners in Jones and Jasper counties, owning real estate in Jasper county upon which they kept mules, horses, and cattle; that Moss was the owner of eighteen head of mules which he used in farming every day, plowing and cultivating crops; that at that season of the year his mules were very necessary in carrying on his business of farming; that it was a busy farming season when the bill was filed, July 3, 1927, requiring the cultivation of crops every day, and that one omitted day in the cultivation of said crops would entail great loss; that the said Moss cared for his mules, kept them free of ticks and other vermin; that his mules were no menace to any one in the way of conveying any kind of contagious or infectious diseases or spreading the cattle or tick fever in Mississippi, and that his mules were used by him in and about his farm work.

It was further alleged in the bill that the live stock sanitary board was engaged in undertaking to eradicate the Texas fever tick from Mississippi under chapter 264, Laws of 1926; that appellee had built dipping vats in Jasper county filled with an arsenical solution very poisonous in its nature and dangerous to live stock, unless weather conditions are right, and unless the solution is properly prepared and mixed; and that in said vats they propose to dip all kinds of live stock, including horses, mules, and cattle.

Appellant B. L. Moss, and other appellants, further allege that they lived about six miles from the nearest dipping vat, and that in the month of July, when the busy crop season was on, the regulations requiring them to carry stock to the dipping vat that distance are unreasonable, and that their mules were not then, and never have been, infected with the cattle tick.

There was further exhibit to the bill, viz., a notice, a copy of which was delivered to each of the appellants, directing them to dip their live stock at a dipping vat provided, on July 5th to July 8th, and regularly each two weeks thereafter until further notified, and advising the owners that their cattle, horses, mules, jacks, and jennets on their premises were infected with ticks (*Margaropus annulatus*), or were exposed to such infection, and this notice was signed by R. V. Rafnael, state veterinarian, by J. E. McCarty, live stock inspector.

The bill set up that all of the appellants will suffer irreparable injury by the enforcement of said rules and regulations, and incur great loss of property and endanger the lives of their stock, and lose a great many days from work, if they should comply with such rules and regulations of the live stock sanitary board.

The live stock sanitary board gave notice through the newspaper that all owners would be required to bring

their stock to the vats and have them dipped, and to have them dipped every two weeks thereafter until notified.

The appellants alleged that this requirement would violate their constitutional rights, and, if carried out, would cause irreparable damage and injury, and that the live stock sanitary board was not liable in a civil action, and that appellants had no redress in a court of law. Appellants then set out section 3 of said act, alleging that this law is void and unconstitutional, and state in their bill that they were ready and willing to dip their live stock at all reasonable times and all reasonable places when the same should be reasonably necessary for the eradication of the cattle tick. Appellants further alleged that, if the appellee carries out its regulations, as it has been threatening to do, and was undertaking to do, the constitutional rights of appellants with reference to their freedom from unreasonable searches and seizures, and their constitutional rights with reference to the rights of property guaranteed under the Constitution, and their rights as to freedom from all unlawful arrests and freedom in their use of their property, will be violated, and their property destroyed.

In addition to the prayer for a temporary injunction, they prayed that the injunction be made perpetual.

The appellee answered the bill, asserting that it was the duty of Moss and the other citizens to obey and uphold the law, and that it was the duty of the live stock sanitary board to enforce the law, admitting that they were undertaking to enforce and carry out the plan for the eradication of the Texas fever tick in Mississippi, and that they had not been charged with the doing of any act that is not within their official duty and not mandatorily required of them by the law; allege the blowing up of a dipping vat in the immediate neighborhood without charging that appellants participated therein; deny that the live stock of the appellants was not infected with

cattle fever tick, and said that they would never be free from the tick until the dipping law was carried into effect. Appellee denied that the law requiring cattle, horses and mules to be dipped every fourteen days was unreasonable, and that the distance from the dipping vat was unreasonable, and denied that the dipping of the live stock would endanger their lives, safety, or health, and made its answer what it called a general demurrer in so far as the act was attacked in a constitutional way.

On proof, the appellants testified that they had looked their live stock and cattle over, and had taken good care of them, and that they did not have any Texas fever tick on them. The distance appellants would have to carry their stock to the dipping vat was shown to vary from three and nine-tenths to five and seven-tenths miles. Appellants and their witnesses testified that on some occasions some of the mules had been known to blister. They did not testify to any serious injuries accruing to any of the live stock within their knowledge from dipping them, and the veterinarian who testified both for appellants and appellee said that, when the solution was properly prepared, there would be no serious, or, in fact, no impairment of the health or impairment of the animals dipped. It was further shown that Jasper county was within the infested area, an area against which is maintained a quarantine by the United States government, being treated by the authorities of the state of Mississippi and of the United States as an infected and infested area with what is commonly called Texas cattle fever tick.

The statutes involved are really chapters 264 and 265 of the Laws of 1926, together with an amendment of section 3 of chapter 264, being chapter 61 of the Laws of 1928. Section 1 of chapter 264 provides for reorganization of the live stock sanitary board, to consist of the commissioner of agriculture, who shall be *ex officio* chair-

man; the professor of animal husbandry at the A. and M. College; the professor of veterinary science at the said college, the latter to be state veterinarian, executive officer, and secretary of same; one veterinarian to be appointed by the Governor; and one stockman to be appointed by the Governor. Section 2 fixes the headquarters and provides for meetings of the board. Section 3 invests this board with plenary power to deal with all contagious and infectious diseases of animals, and with full and plenary power to make, promulgate, and enforce. rules and regulations which, in its judgment, may be necessary to control, eradicate, and prevent the introduction and spread of anthrax, tuberculosis, hog cholera, Texas, and splenic fever, and the fever carrying tick (*Margaropus annulatus*), and all other diseases of animals in this state; and further provides for the appointment of as many inspectors and range riders as may be deemed necessary, to enter premises and inspect the live stock, and enforce quarantine.

Chapter 265 authorizes the board to appropriate funds with which to carry out the purposes of the live stock sanitary board, and directs the systematic dipping of live stock. The board of supervisors was authorized to provide dipping vats in such number as necessary, same to be fixed by the state veterinarian, and there is provision made for the appointment of inspectors and range riders. Said chapter also provides that boards of supervisors may be compelled to comply with the provisions of this act. Section 7 of said act reads as follows:

"Any person, or persons, firms or corporations, owning or having in charge any cattle, horses, jacks, jennets or mules in any county where tick eradication shall be taken up, or is in progress under existing laws, shall, on notification by any live stock inspector to do so, have such cattle, horses, jacks, jennets or mules dipped regularly every fourteen days in a vat properly charged with

arsenical solution, as recommended by the United States Bureau of Animal Industry under the supervision of said inspector, at such time and places and in such manner as may be designated by the live stock inspector. All animals dipped shall be marked for identification. The dipping period shall be continued as long as may be required by the rules and regulations of the state live stock sanitary board, which shall be sufficient in number and length of time to completely destroy and eradicate all cattle ticks (*Margaropus annulatus*) in such county or counties.''

Section 8 provides for notices to be posted where owners cannot be found. Section 9 provides for the procedure when an owner fails to dip his cattle. Section 10 provides for the sale of animals when an owner fails to dip his cattle, and establishes a lien thereon. Section 11 makes it a misdemeanor for any person, firm, or corporation to violate any of the provisions of the rules of the live stock sanitary board, punishable by a fine of not less than five dollars nor more than three hundred dollars, and not more than thirty days in jail.

Counsel for appellants invites us to make a very broad survey of all sections of the Constitution pertaining to personal rights and liberty of citizens of the state of Mississippi and of the United States, but, as we interpret their brief, they seem to argue that the provisions of the act and the regulations of the live stock sanitary board violate the due process clause of the Federal and state Constitutions. A great portion of the briefs of counsel in this case is devoted to the rights of red-blooded American citizens and to counter charges as to blowing up the dipping vats by the use of the explosive called dynamite.

We take judicial cognizance of the fact that Texas cattle tick (*Margaropus annulatus*) and the fever resulting therefrom are regarded by the authorities of this nation and state as a menace and that the areas, con-

sisting of some twenty-two or twenty-three counties, in Mississippi, against which the balance of the United States is quarantined, are so quarantined because the live stock there are infested with this peculiar kind of tick.

We think chapters 263, 264, and 265, together with the amendment to section 3 of chapter 264, amount to a declaration on the part of the legislature of this state that the Texas cattle tick is a nuisance, and that its destruction would add to the general welfare, happiness, and health of the people; and we are convinced that the only known way to eradicate the tick is by dipping, so that the cattle and horses may be free from them for such a length of time as that the tick can no longer propagate his kind and endanger the lives of cattle and live stock, as well as cause great commercial loss because of the quarantine against cattle in infested areas and the consequent depreciation in value and price; as well as add to the health and happiness of little children who will, by the eradication of the said tick, not be required to drink milk from fever infected cows.

1. This complete scheme for the eradication of the Texas tick and the prevention of the Texas tick fever within the commonwealth falls fairly within the scope of the police power retained unreservedly in the several states of the Union, in so far as the Federal Constitution is concerned, and the said power is the foundation upon which rests our social system. ''The welfare of the commonwealth is the supreme law.'' The Federal Constitution presupposes and conceives the existence of the police power, and is construed with reference to that assumed fact. See 12 C. J., p. 907.

The scope of the police power is as broad as the public welfare, and perhaps the broadest in its scope in the whole field of government activity. It changes from time to time in order to meet the changed conditions of society.

The application of the principle on which it is based changes to meet and fit new conditions as they arise. 12 C. J. 907-909.

As affecting individual freedom, we quote the following: "A police regulation, obviously intended as such, and not operating unreasonably beyond the occasions of its enactment, is not rendered invalid by the fact that it may affect incidentally the exercise of some right guaranteed by the Constitution; as for example, it is said that the exercise of the police power is not subject to restraint by constitutional provisions designed for the general protection of rights of individual life, liberty and property." 6 R. C. L., p. 193.

It has often been held that quarantine laws for the purpose of isolating diseased cattle and preventing the communication of the disease to other cattle is permissible, and it has also been held that a board or commission set up by the legislature to carry out the mandates of the statute may make all reasonable and necessary regulations to that end within the scope of the authority conferred. 3 C. J., pp. 51, 52.

In the case of *Ormand* v. *White*, 85 Miss. 276, 37 So. 834, the court had for consideration the constitutionality of the statute authorizing the establishment of the stock law districts, and Chief Justice WHITFIELD, as the organ of the court, said: "It is far too late now to question in Mississippi the constitutionality of the statutes like the one here assailed. That the act is constitutional is thoroughly settled by the cases of *Schulherr* v. *Bordeaux*, 64 Miss. 59, 8 So. 201, and *Alcorn* v. *Hamer*, 38 Miss. 652, with the authorities cited in these two cases and in the briefs of counsel in the two cases."

In the case of *Abbott* v. *State*, 106 Miss. 340, 63 So. 667, the court had under consideration the constitutionality of chapter 106, Laws 1908, creating the live stock sanitary board and delegating power and authority to it for regu-

lating live stock matters and to prevent the introduction and spread of tick fever and other contagious diseases, and to establish and maintain a quarantine, and therein the court held that: "It seems clear that the Legislature may confer upon the Live Stock Board the power to make rules and regulations to prevent the introduction and spread of contagious or infectious diseases of live stock, and in the same act provide penalties for violations of such rules and regulations thereafter to be adopted. In such legislation it is the legislature that makes a violation of the rules and regulations a crime, and not the live stock board that makes the violation thereof a crime. Much authority may be found to the effect that legislation of this character is not a delegation of legislative functions, but we believe it unnecessary to collate the authorities here."

In the case of *Hawkins* v. *Hoye,* 108 Miss. 282, 66 So. 741, the court was dealing with the constitutionality of the statute creating the state board of health and with the validity of ordinances enacted by that board requiring dairy cows to be examined annually by a competent veterinarian in order to determine whether or not the cows were infected with tuberculosis or other contagious diseases in cattle, and the court held that the statute creating the state board of health was valid, approving the delegation of legislative power, and saying: "The legislature, by virtue of the police power of the state, may enact all needful laws for the purpose of preserving the health, preventing the spread of disease, and protecting the lives of the citizens. Under this power the legislature may create boards of health and bestow upon them necessary power to promote the general health of the people by providing for them healthful conditions." And the court further said: "The rule or ordinance complained of is not unreasonable and void as contended by appellant" and further said: "This ordinance was not

only reasonable but quite important and valuable in the preservation of the health of the citizens."

The general welfare of the commonwealth should be the chief concern of the legislature, and, for that reason, a very large and very broad discretion is lodged in that branch of the government to decide what measures are necessary to protect the public interest. *Barbier* v. *Connolly*, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923; *Kidd* v. *Pearson*, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346.

Statutes or ordinances which authorize the destruction of animals having infectious or contagious diseases have been sustained in a vast number of cases as proper exercise of police power of the state. *Durand* v. *Dyson*, 271 Ill. 382, 111 N. E. 143, Ann. Cas. 1917D, 84; *Chambers* v. *Gilbert*, 17 Tex. Civ. App. 106, 42 S. W. 630, in which case a writ of error was denied by the supreme court. The power to quarantine animals for the purpose of eradicating and preventing disease falls within the police power, and is not prohibited by the Constitution. *Smith* v. *St. Louis & S. W. R. Co.*, 181 U. S. 248, 21 S. Ct. 603, 45 L. Ed. 847.

We then come to the conclusion that under the police power of the state the legislature had the right to create the live stock sanitary board for the purpose of quarantining and treating animals within the infested area with the ultimate purpose of completing the eradication of the Texas cattle fever tick, and that, in so far as the Fourteenth and Fifth Amendments to the Constitution of the United States are concerned, and that, so far as the delegation of power and restriction of the liberty of the citizen in dealing with his property is dealt with in this act, it does not violate, and is not condemned by, these various sections of the state Constitution.

2. Is the regulation requiring the appellants, Moss and his associates, to carry their live stock a distance varying from three and nine-tenths to five and seven-

tenths miles, for the purpose of having them inspected and dipped in a vat, an unreasonable regulation? Counsel has called our attention to no case wherein any similar ordinances or regulations have been determined to be unreasonable. Appellants say that it required one man for each two mules to carry them to and from the dipping vat, and that this is an unreasonable distance. This record shows that dipping vats had been erected by the governing authorities closer to the property of appellants, but they had been destroyed by blowing them up with dynamite. We think it is idle, under the proof in this case, which shows that all the citizens of Jasper county, save these complaining appellants, are complying with the dipping regulations, for us to now consider these regulations to be unreasonable in their demand upon the citizen to comply therewith at the time and place specified in the notice. It is not an unreasonable distance, and we think the appellants greatly magnified the loss of time in man power and mule power. The writer of this opinion has driven mules in his younger days, and knows what every farmer in Jasper county knows, that it was not necessary to send one man with each pair of mules, nor necessary to take much time to travel the distance indicated. This regulation was really an effort on the part of the government to help increase the value of appellants' live stock, and an effort to save both time, money, and property, as well as to have them do what had been regarded as a reasonable regulation for the entire county, and, we might add, by a majority of the citizens of the state. It is not controlling, but we point to it only as illustrative, that the rights and liberties of Moss and his associates are so small as compared to the large benefit accruing to the entire commonwealth as to make us say, without hesitation, that the ordinance was not unreasonable, and they really had no excuse for not complying with the reasonable demand of the state.

But appellants urge that this solution in which the animals were dipped is composed of arsenic, which we know to be a dangerous poison. But, in the record in this case, it is said by the veterinarian, and not disputed, that the death rate of animals so dipped is about "six in a million." And, in addition, if perchance, by reason of this poison, an animal dipped should die, chapter 38 of the Laws of 1917 (section 4121, Code 1927), is still in existence, providing that: "Any person in any county in this state shall be entitled to recover from such county reasonable compensation for any live stock owned by such person that may have been killed or permanently injured since March 1, 1916, or that may hereafter be killed or permanently injured in the process of dipping or as a result of such dipping for the eradication of the cattle tick, where such dipping was done under the supervision of the board of supervisors or the live stock sanitary board." This section has not been repealed; hence the phrase used by appellants was a mere hobgoblin raised by them in their efforts to defeat the effectual carrying out of the law.

But counsel further say that the loss of time from crops puts an unreasonable demand upon appellants. We are not able to apprehend this species of argument against the enforcement of the law. In the first place, it is a matter of common knowledge, in South Mississippi especially, that crops have advanced well toward the safe period on July 5th, and on July 19th and 26th the farmer whose crops are in such urgent need of labor is unusual, an exception, and the law was not made for exceptional and unusual cases.

3. It is argued that the provisions of section 3, which authorizes inspectors and range riders to enter premises of those who live within the quarantined area, and inspect the live stock therein, are violative of section 23 of our Constitution, relative to unreasonable searches and

seizures, rendering the whole act unconstitutional. In the first place, for aught that appears in this record, the live stock sanitary board may have adopted a reasonable regulation for the enforcement of this provision as to those individuals who have violated the ordinance requiring them to deliver their live stock at a specified time and place to be inspected and dipped. As was said in the case of *D'Aquilla* v. *Anderson et al.* (Miss.), 120 So. 434: "The act does not, in terms, authorize the range riders or the sheriff to enter the inclosed premises and seize and take away property of the owner without demand. If possession is refused on demand, then appropriate legal proceedings, including an opportunity to be heard by the person owning the cattle or live stock in some tribunal authorized by law to pass upon the question, should be taken."

Conceding, however, for the purpose of this discussion only, that the provisions of section 3 of the act which authorizes inspectors and range riders to enter the premises of those who live within the quarantined area to inspect and disinfect live stock is unconstitutional and void, still this provision cannot affect the appellants, so long as they obey the reasonable and constitutional requirement that they shall dip their live stock every fourteen days, upon proper notice so to do, and, this being true, they cannot invoke the aid of a court of equity to enable them to continue to disregard and violate the law merely because there is some threatened invasion of their constitutional rights, if they persist in such law violations.

However, we will say that, even if at some future day the constitutionality of this particular part of section 3 should be raised in a proper case, by an individual who has the right to raise it, and the right to evoke from this court a decision, and that decision should result in this court concluding that this provision is void and uncon-

stitutional, the balance of the act is so perfectly complete as that we do not think it necessary now to cite authorities to show that the said balance of the act would be held constitutional and only the void provision stricken down.

4. We are not called upon, however, at this time to pass upon this proposition, because the appellants are so situated as that we have already determined that the regulations which required them to appear and have dipped their live stock at the Stringer vat on July 5th was a reasonable and valid regulation, and the appellants have violated, ignored, and undertaken to enjoin the enforcement of this regulation; are subject to criminal prosecution in Jasper county; and have appealed to a court of equity to permit them to continue to violate this reasonable regulation. Can individuals who have determined to be violators of the law, engaged in illegal acts as defined by section 11 of the act, which, in terms, provides that any person who violates any of the provisions of the rules and regulations of the live stock sanitary board shall be guilty of a misdemeanor, have the protection of equity that they may persist in their iniquity? It is our conclusion that the strong, fair, justice dealing hand of equity may not be invoked to carry on and perpetuate an illegal, unlawful transaction. He who seeks equity must do equity, and, also, he who comes into equity must come with clean hands. The latter maxim is much stronger and much more efficient in its operation. It says that "whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere in his behalf, to acknowledge his right, or to award him any remedy." Pomeroy's Equity Jurisprudence (4 Ed.), p. 397.

In 21 Cyc., p. 191, section 178(b), on Illegal Transactions, it is said: "To the extent and within the limits discussed elsewhere in this work, the maxim excludes from a court of equity either party to a transaction tainted with any form of illegality, either to enforce it, or to obtain relief against it, or one seeking to protect a right operating against public policy. A court of equity in one state will not lend its aid to the consummation of a transaction in another state in violation of the laws thereof. An illegal contract cannot be enforced either at law or in equity, and consequently this maxim is not needed to defeat relief in respect to such contracts."

As illustrative, plaintiff cannot have the aid of equity to restrain from abatement, although the defendant has no authority to abate. *Pittsburgh, etc., R. Co.* v. *Crothersville*, 159 Ind. 330, 64 N. E. 914.

Where a telephone company is maintaining a nuisance by the unauthorized use of city streets, it has no standing in equity to prevent the use of such streets by another telephone company. *Nebraska Telephone Co.* v. *Western Independent Long Distance Tel Co.*, 68 Neb. 772, 779, 95 N. W. 18.

The proprietor of a gambling house cannot have an injunction to prevent the stationing of policemen on the premises. *Weiss* v. *Herlihy*, 23 App. Div. 608, 49 N. Y. S. 81.

Where a party has sought out the location of bawdy houses, and voluntarily erected a house for business purposes, intending to attract those who resort to the bawdy houses as customers, and has acquiesced in the nuisance for a period of time, for that reason equity will leave the complaining party in the position he has placed himself. *Snyder* v. *Keiter*, 4 Alaska, 447. See, also, *Modern Horse Shoe Club* v. *Stewart*, 242 Mo. 421, 146 S. W. 1157, and 21 C. J., p. 190, section 177.

What we have said here applies also to counsel's reference to the sections dealing with the dipping and sale of stock belonging to those individuals who have refused to obey the regulations here under consideration. Appellants here have committed inequity, and they shall not have the assistance of equity, when they have deliberately refused to obey these regulations, excusing themselves from so doing by saying that they thought the regulations were unreasonable and invalid. We have concluded otherwise. The doors of the court of equity are closed to these appellants, unless and until they comply with the reasonable regulations to carry their stock to the Stringer vat or some other reasonable place and have them dipped as the law requires. They may not refuse to obey the plain, mandate of the law and then invoke equity's assistance. Their conduct, in so far as equity is concerned, was willful in connection with the transaction, but they now seek the protection of equity. The appellants were not entitled to any relief, nor were they entitled to an injunction, and the court below so held.

*Affirmed.*

On Suggestion of Error.

Smith, C. J., delivered the opinion of the court on suggestion of error.

After a re-examination thereof, we remain satisfied with the views expressed by us in the opinion rendered when this case was decided.

One question only will be here discussed. The court below allowed the appellee an attorney's fee of five hundred dollars for services rendered by its attorney in obtaining the dissolution of the injunction herein. In the suggestion of error it is said that no attorney's fee should have been allowed, for the reason that no claim was made therefor, and no evidence in support thereof was introduced, in the court below.

In the briefs filed by counsel for the appellant, when this case was tried on its merits, complaint was made of

the allowance of this attorney's fee, but for reasons different from that now urged thereto, but we will waive that fact and take the matter up again for consideration. The record discloses the following notice filed in the court below by counsel for the appellee:

"*B. L. Moss, et al.* v. *Live Stock Sanitary Board et al.*

"To the Plaintiffs in the above stated case, or to Hon. Jeff Collins, their attorney of record:

"Please take notice that upon a dissolution of the injunction in the above stated case the defendants will offer evidence to prove, and will claim by way of damage for the wrongful, suing out of said injunction an attorney fee amounting to one thousand dollars.

"R. L. Bullard, Attorney for Defendants.

"Filed Aug. 15, 1928.

"T. D. BRAME, Clerk."

No opinion evidence of the value of the services rendered in the court below by the attorneys for the appellee was introduced. Such evidence would have been competent, but would not have been controlling, *Humphreys County* v. *Cashin,* 128 Miss. 236, 90 So. 888, and was not indispensable. The amount of the attorney's fee which the court below should have awarded must be determined by the character of the services rendered, the time consumed in the rendition thereof, and the magnitude of the interests involved. *Holly Springs* v. *Manning,* 55 Miss. 380; *Humphreys County* v. *Cashin, supra.* The services of the appellee's attorneys were rendered under the eye of the chancellor who tried the case, and the character thereof and magnitude of the interests involved appear on the record made before him; consequently he was fully competent to determine the value of such services without hearing evidence relative thereto. 6 C. J. 760, note 93.

*Overruled.*